UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

PHILLIP O. LOPEZ and
FELIZ GONZALES,
     Plaintiffs
v.                              No. 2:15-CV-00889 JCH/SMV
THE STATE OF NEW MEXICO,
THE CITY OF LAS CRUCES, and
OFFICER DAVID RODRIGUEZ and
DETECTIVE MICHAEL RICKARDS, in their
official and individual capacities as employees of
the City of Las Cruces,
     Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter comes before the Court on the following motions: (i) Plaintiff Feliz Gonzales's Motion for Partial Summary Judgment against Defendants City and Rodriguez (ECF No. 28); (ii) Plaintiff Phillip Lopez's Motion for Partial Summary Judgment against Defendants City and Rodriguez (ECF No. 131); and (iii) Defendants' Motion for Summary Judgment Based on Qualified Immunity and Governmental Immunity (ECF No. 138). The Court, having considered the motions, briefs, evidence, and relevant law, concludes that Plaintiffs' motions will be denied and Defendants' motion will be granted in part and denied in part.

I.       **FACTUAL BACKGROUND**[1]

On the evening of January 4, 2015, Officer David Rodriguez was on duty as a police officer for the City of Las Cruces. Defs.' Resp. to Pl. Lopez's Mot. for Summ. J., Undisputed Fact ("UF") ¶ 1, ECF No. 143. He was dispatched on a non-emergency, non-domestic disturbance call to an address at 624 West Court Road regarding a dispute and threats between

---

[1] Many of the facts are undisputed. Where a dispute of fact exists, the Court will set forth the respective parties' version of events, as supported in the record. The Court will construe the facts in the light most favorable to the non-moving party in the analysis of each party's respective motion for summary judgment.

neighbors. *See* Pl. Lopez's Mem., UF ¶ 1, ECF No. 132; Defs.' Resp. to Pl. Lopez's Mot. for

Summ. J., UF ¶ 3, ECF No. 143; Pretrial Order, Stipulated Factual Contentions ¶¶ IV(A)(4)-(5),

ECF No. 179; Dep. of David Rodriguez 135:3-13, ECF No. 148-1. Dispatch informed Officer

Rodriguez that threats occurred in which a neighbor said he was going to kill the other. Dep. of

David Rodriguez 126:1-25, ECF No. 143-1.[2] At the time he arrived at the address, Officer

Rodriguez did not know who had made the call or who had allegedly made threats. Pl. Lopez's

Mem., UF ¶ 2, ECF No. 132.

When Officer Rodriguez arrived at the scene, he saw a man, who he later learned to be

Phillip Lopez, standing in front of the 624 West Court residence. Defs.' Resp. to Pl. Lopez's

Mot. for Summ. J., UF ¶ 3, ECF No. 143. At the time he encountered Mr. Lopez, Officer

Rodriguez did not know whether Mr. Lopez was involved in the dispute to which he was

dispatched. Pl. Lopez's Mem., UF ¶ 3, ECF No. 132.

The parties dispute what happened next. Officer Rodriguez testified that he saw Mr.

Lopez take off running towards the house after he observed Officer Rodriguez. *See* Dep. of

David Rodriguez 127:16-128:22, ECF No. 143-1. Officer Rodriguez considered Mr. Lopez's

behavior suspicious because he was in the area of the dispute and fled when seeing law

enforcement. *See id.* 128:16-129:20.[3] Mr. Lopez testified that, after he saw the police cruiser, he

walked quickly to his grandmother's front porch and then to his apartment door where he handed

---

[2] Plaintiff disputes this fact, arguing that Defendants' cited portion of the record did not address the type of dispatch call. Pl.'s Reply 2, ECF No. 154. While Plaintiff is correct that the citation to 128:16-25 does not address the dispatch call, 126:16-25 of Officer Rodriguez's deposition supports this fact, and the Court will therefore consider that evidence.
[3] Plaintiff contends this fact is irrelevant because Officer Rodriguez's subjective state of mind is not at issue. The Court includes the fact for context, but recognizes that the qualified immunity analysis looks to whether a reasonable officer would objectively believe the behavior suspicious.

off his dog. *See* Phillip Lopez Dep. 66:18-67:25, ECF No. 143-2 (responding "Quickly" to question, "How quickly did you hand off – did you take the dog to your – ").

Officer Rodriguez decided to investigate, and he drew his gun and came around the house in a circular motion to see if he could see Mr. Lopez from a better angle. *See* Dep. of David Rodriguez 128:16-130:11, ECF No. 143-1. Officer Rodriguez saw Mr. Lopez in an open doorway with the light on inside the home. *Id.* 130:8-17. While pulling his gun out and pointing it at Mr. Lopez, Officer Rodriguez commanded Mr. Lopez to put his hands up. *Id.* 130:8-17, 132:7-133:1; Dep. of Phillip Lopez 68:16-69:2, ECF No. 143-2; Corrected Answer ¶ 8, ECF No. 39; Pretrial Order, Stipulated Fact ¶ IV(A)(9), ECF No. 179.

The parties dispute what next occurred. According to Mr. Lopez's version, Officer Rodriguez told Mr. Lopez, "Get the fuck over here. Put your hands up," at which point Mr. Lopez walked toward Officer Rodriguez and responded, "My hands are in the fucking air." Dep. of Phillip Lopez 68:16-70:11, ECF No. 143-2. Mr. Lopez asserts that Officer Rodriguez told him to stop, at which point, he removed his jacket, turned around to show him his waistband as he had ordered, and then continued walking toward him. *Id.* According to Mr. Lopez, he followed Officer Rodriguez's orders to approach, and closed distance to show him that his hands were in the air and to ask what he wanted. *Id.* 72:15-22.

According to Officer Rodriguez, he identified himself as a police officer and told Mr. Lopez to put up his hands. *See* Dep. of David Rodriguez 130:12-131:3, ECF No. 143-1. Mr. Lopez then turned around and said, "Oh, you want to see my hands. I'm not going to show you my fucking hands," and he started making non-compliant gestures, throwing his hands around, and walking toward Officer Rodriguez. *Id.* 131:4-17. Although Mr. Lopez did not verbally

threaten Officer Rodriguez, Officer Rodriguez testified that Mr. Lopez advanced towards him while Officer Rodriguez kept telling him to put up his hands, and at one point, Officer Rodriguez told him to stop, and he did not stop. *See id.* 131:5-132:14. Instead, Mr. Lopez continued walking toward him and lifted his shirt up, revealing that he did not have a weapon. *See id.* 132:7-133:25.

The parties agree that, around that point in time, Feliz Gonzales came beside Phillip Lopez. Defs.' Mem., UF ¶ 12, ECF No. 139. Officer Rodriguez first heard her and did not know from where she came. Dep. of David Rodriguez, 133:6-134:21, ECF No. 139-1.[4]

According to Officer Rodriguez, both Ms. Gonzales and Mr. Lopez continued to walk towards him, he told them to stop, and he retreated backwards to the street to create distance. *See id.* 133:17-134:5. Once Officer Rodriguez was in the street, he put away his gun and pulled out his Taser. *See id.* 133:17-136:22.

Plaintiffs' version differs. Mr. Lopez avers that he came towards Officer Rodriguez, because Officer Rodriguez commanded that he come here with his hands in the air, so he followed those instructions. Dep. of Phillip Lopez 72:15-22, ECF No. 139-2.

The parties agree that Mr. Lopez moved in front of Ms. Gonzales when he saw the infrared targeting light of the Taser on her because he believed it was a targeting light from a gun. Defs.' Mem., UF ¶ 13, ECF No. 139. Immediately after Mr. Lopez moved in front of Ms. Gonzales, Officer Rodriguez stunned Mr. Lopez with his Taser. *Id.* UF ¶ 14. Officer Rodriguez stunned Ms. Gonzales second with the Taser. *Id.* UF ¶ 15. At that point, both Plaintiffs were simultaneously connected by the Taser prongs to Officer Rodriguez's Taser. Defs.' Resp. to Pl.

---

[4] Defendants assert in their motion for summary judgment that Officer Rodriguez saw Mr. Lopez standing in front of the open door with Ms. Gonzales, but the citation to the record does not support that fact. Defendants in their reply did not address Plaintiff's contention that the record instead supported the fact that Officer Rodriguez did not see Ms. Gonzales in the doorway.

Gonzales' Mot., UF ¶ 2, ECF No. 41. Ms. Gonzales fell to the ground, where she remained, face down, without moving throughout the incident. *See* Defs.' Mem. UF ¶ 18, ECF No. 139; Pl. Gonzales' Mot. for Partial Summ. J., UF ¶ 2, ECF No. 29. Ms. Gonzales was closer to Officer Rodriguez than Mr. Lopez was after they were both initially tased. Defs.' Mem., UF ¶ 16, ECF No. 139. Mr. Lopez questioned Officer Rodriguez as to why he tased his wife and demanded that he leave her alone. Corrected Answer ¶ 16, ECF No. 39. The parties also agree that at some point Mr. Lopez attempted to remove his Taser prongs, and did so. Defs.' Mem. for Summ. J., UF ¶ 18, ECF No. 139.

The parties, however, dispute much of what occurred during the time period in which Officer Rodriguez deployed his Taser. According to Officer Rodriguez, he gave Plaintiffs commands to back up, which they did not follow, which is why he initially shot his Taser at each of them. *See* Defs.' Ex. C (video); Dep. of David Rodriguez 136:2-12, ECF No. 139-1. He also asserts that he continued to tase Mr. Lopez because he was trying to remove the Taser prongs and stand. *See* Dep. of David Rodriguez 137:7-13, ECF No. 139-1. Mr. Lopez was never able to get to his feet. *Id.* 143:13-15. Officer Rodriguez testified that he did not intend to tase Ms. Gonzales after the first Taser shot and did not realize he was sending charges through her until the last time he attempted to tase Mr. Lopez when he was trying to get up. *See id.* 139:7-14.[5]

According to Mr. Lopez, after he was initially tased, he fell to the ground and did not move from a seated position, and he put his arms in the air. *See* Dep. of Phillip Lopez 77:13-21, ECF No. 139-2. Plaintiffs dispute that Officer Rodriguez did not know that he was tasing Ms.

---

[5] Plaintiff contends that Defendant Rodriguez admitted that he realized he was tasing Ms. Gonzales before he radioed for back-up, which occurred before the final tasing of Ms. Gonzales. Pls.' Resp. ¶ J, ECF No. 148. Officer Rodriguez, however, clearly testified that he did not realize he was tasing Ms. Gonzales until the last time he tased Mr. Lopez. Dep. of David Rodriguez 139:7-14, ECF No. 139. The portion of the testimony that Plaintiff argues is an admission is unclear and does not clearly refute the statement that he did not know he was tasing her until the last discharge, and thus, when considering Ms. Gonzales' motion for summary judgment, the Court will construe the record and inferences in favor of Officer Rodriguez.

Gonzales because the recorded audio from the video camera reveals screams, crying, and distress from a woman. *See* Defs.' Ex. C. The electric current going from the Taser to only Ms. Gonzales was visible. Pls.' Resp., UF ¶ I, ECF No. 148 (citing Defs.' Ex. C).

The parties do not dispute that, during the subsequent Taser discharges, Officer Rodriguez yelled repeatedly to "stay on the ground." *See* Defs.' Ex. C. At some point during the Taser incident, the parties agree Mr. Lopez yelled to his neighbor to get his dog. *Compare* Defs.' Mem. for Summ. J. ¶¶ 19-20, ECF No. 139, *with* Pls.' Resp. ¶¶ 19-20, ECF No. 148. According to Officer Rodriguez, he knew Mr. Lopez was yelling something to somebody down the street, but he could not hear what Mr. Lopez was saying because he was telling him not to say anything. Dep. of David Rodriguez 141:17-21, ECF No. 139-1. The parties agree that, during this exchange, Officer Rodriguez yelled several times, "Stop talking!" and "Stop talking or I'll tase you again!" Corrected Answer ¶ 18, ECF No. 39. Shortly thereafter, Officer Rodriguez discharged the Taser again. *See* Defs.' Ex. C.

The parties agree that Officer Rodriguez sent 10 additional cycles through Ms. Gonzales after the initial incapacitating shot. Pl. Gonzales' Mem., UF ¶ 5, ECF No. 29. Ms. Gonzales suffered injuries as a result of the additional Taser discharges. *Id.* UF ¶ 6. Both Plaintiffs were arrested that night and went to jail. Defs.' Mem., UF ¶ 23, ECF No. 139.

The parties dispute the capabilities of the Taser. Defendants presented evidence that the arc button on the X2 Taser that Officer Rodriguez had allows an officer to stun both or only one person. Aff. of David Rodriguez ¶¶ 25-26, ECF No. 41-1. Plaintiff Gonzales disputes this fact, contending that, once the prongs are in two subjects, if the trigger is used to send an arc, it is sent through both subjects simultaneously. Pl. Gonzales's Reply 3, ECF No. 42. In support, Plaintiff relies on portions of the X2 TASER User's Manual and asks the Court to take judicial notice of

the Owner's Manual and its accuracy. *Id*. at 3 n.2. This Court cannot take judicial notice of this fact, because the accuracy of the manual is not "generally known within the trial court's territorial jurisdiction," nor can it be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Because the Manual is hearsay without accompanying sworn testimony stating what it is and its accuracy, the Court cannot consider its contents as facts and will instead consider the Taser capabilities to be disputed.

On January 3, 2015, the day before the Taser event, Agent Charles Boylston from the New Mexico State Police, after receiving a phone call from Asset Protection Officer Gabe Martinez, started an investigation of a shoplifting by an unknown couple at a Wal-Mart store. Defs.' Mem., UF ¶ 24, ECF No. 139; Dep. of Charles Boylston 40:19-22, ECF No. 160-4. The Wal-Mart shoplifters had a child with them. *See* Pls.' Resp., UF ¶ Q, ECF No. 148. Agent Boylston, being fairly new to retail investigations, did not know as many people, so he requested the help of Detective Michael Rickards to determine if other officers could identify the suspects. *See* Dep. of Charles Boylston 41:16-42:22, ECF No. 139-4. Detective Rickards then sent an email with photographs of the couple to all the officers at the Las Cruces Police Department for assistance in identifying them. Defs.' Mem., UF ¶ 25, ECF No. 139.

Lieutenant Casey Mullins saw a "BOLO" ("Be On the Lookout") with a photograph of Mr. Lopez that had been sent out for officer safety reasons following the altercation between Plaintiffs and Officer Rodriguez. *See* Dep. of Casey Mullins 11:19-12:12, 17:24-19:2, 20:14-21:25, ECF No. 163-2. Lieutenant Mullins responded by email to Detective Rickards that the photograph he sent looked like the person in the BOLO. *See* Dep. of Casey Mullins 11:19-12:12, 18:20-19:2, 20:14-21:25, ECF No. 163-2; Dep. of Michael Rickards 62:5-63:4, ECF No. 139-6; Dep. of David Rodriguez 62:5-11, ECF No. 148-7. Detective Kaycee Thatcher responded by

email saying that it looked like the person about which she had just sent an email. Dep. of Michael Rickards 28:18-21, ECF No. 163-1. On January 5, 2015, Transport Officer Alfredo Carbajal transported Plaintiffs from jail to court. Defs.' Mem. UF ¶ 27, ECF No. 139. While in court with Plaintiffs, Officer Carbajal received an email with photographs from Detective Rickards requesting assistance in identifying the couple in the photos. *Id.* UF ¶ 29.[6] Officer Carbajal reported to Detective Rickards that it looked like Plaintiffs. *See* Dep. of Alfred Carbajal 8:10-25, ECF No. 139-5.

On January 5, 2015, Officer Rodriguez completed an Affidavit and Criminal Complaint charging Plaintiff Feliz Gonzales with petty misdemeanor assault on an officer under the Las Cruces Municipal Code. Statement of Facts in Support of Compl., ECF No. 148-4. In the charging documents, after describing the encounter on January 4, 2015, he petitioned the Court to accept the statement facts and charge her "with shoplifting." *Id.*

Around this time, Detective Rickards sent Officer Joshua Milks a photograph of a couple from a Hastings store and asked if he recognized the people. *See* Pl.'s Resp., UF ¶ N, ECF No. 148; Dep. of Joshua Milks, 14:9-16:17, ECF No. 148-6. Officer Milks had previously met Mr. Lopez and Ms. Gonzales during their booking following their arrests for assaulting a police officer. Dep. of Joshua Milks 4:22-5:6, 8:16-25, ECF No. 163-4. When Officer Milks responded that he could not, Detective Rickards asked if they were Mr. Lopez and Ms. Gonzales, to which Officer Milks answered that they could possibly be, but due to the graininess of the photo, he could not positively identify them. *See id.*

---

[6] Plaintiff contends it is unclear if Officer Carbajal received photos from the Walmart or Hastings store. Defendants reply that the metadata for the text messages indicates that the photos from Hastings were not created until January 6, 2015, after Officer Carbajal received the photos. Defendants attach a copy of an Extraction Report, but without an accompanying affidavit explaining the authenticity of the report. The Court will therefore not consider the report at this stage because it is inadmissible hearsay. *See* Fed. R. Evid. 801.

On January 6, 2015, around 7:00 p.m., Detective Rickards texted Officer Rodriguez photographs of a couple from the Hastings store. Defs.' Mem., UF ¶ 32, ECF No. 139. At this time, Detective Rickards knew there was some sort of physical altercation between the police and Mr. Lopez and his wife, but he did not know that a Taser had been deployed. Dep. of Michael Rickards 35:16-36:8, ECF No. 160-5.[7] Detective Rickards' text asked, "Recognize these two," to which Officer Rodriguez responded by text message, "Looks like Phillip Lopez and Feliz Gonzales." *See* Pl.'s Ex. C, ECF No. 104-1 at 6 of 7; Pl.'s Reply, Ex. A 54:21-57:24, ECF No. 118-1; Defs.' Mem., UF ¶ 33, ECF No. 139; Dep. of David Rodriguez 153:9-154:3, ECF No. 163-5. Detective Rickards responded, "Atta baby! That[']s what [I] wanted to hear. Ok [I] thought so but [M]ilks was unsure." Pl.'s Ex. C, ECF No. 104-1 at 6 of 7. Officer Rodriguez replied, "Yea I don't think I'll forget them after Sunday." *Id.* Detective Rickards then texted, "That[']s what i figured. You never forgot someone that you fight with. Never." *Id.*  He then explained by text that they did a felony shoplifting on Saturday and tried to hit Hastings today. *Id.* at 7 of 7. Officer Rodriguez replied, "That's good to hear they had nothing but good things to say about the department." *Id.* Detective Rickards replied, "I[']ll make sure they get excellent service." *Id.*

---

[7] Plaintiff asserts that it is undisputed that Defendant Rickards lied about his familiarity with Plaintiffs and the tasing incident under oath at his deposition, citing this Court's Memorandum Opinion and Order reinstating Defendant Rickards in the case. In that order, the Court, relying on the documents before it, stated, "The text messages indicate that, at the time he and Agent Boylston were trying to identify the Wal-Mart suspect on or around January 6, 2015, Defendant Rickards had known of the Taser incident between Plaintiffs and Defendant Rodriguez, contrary to what his sworn testimony suggested." Mem. Op. and Order 7, ECF No. 130. At that time, the Court did not have the benefit of the more developed record before it now, and had not reviewed a later portion of Detective Rickards' deposition in which, when specifically asked how he knew to contact David Rodriguez with the photographs, he testified that he knew of a physical altercation between the police and Mr. Lopez and his wife, but did not know it involved a Taser. Dep. of Michael Rickards 35:16-36:21, ECF No. 160-5. Based on the record now before it and Detective Rickards' subsequent clarification of his testimony, the Court will not enter a finding that Defendant Rickards lied in his deposition when he said he did not know about the Taser incident. His later explanation that he knew that there had been a physical altercation is consistent with the contents of the text messages.

Sometime on January 6, 2015, Detective Rickards contacted Agent Boylston and said to stop by his office because he had a picture of his guy and that some officers in his agency may have identified his people. *See* Dep. of Charles Boylston 43:14-24, ECF No. 139-4, and 60:15-23, ECF No. 163-3; Dep. of Michael Rickards 31:7-24, 36:18-23, ECF No. 160-5, and 63:12-64:8, 65:12-66:18, ECF No. 163-1. When Agent Boylston walked into Detective Rickards' office, Detective Rickards handed him a driver's license photo and said, "This is your guy," giving the name of the man in the driver's license photograph as Phillip Lopez. *See* Dep. of Charles Boyston 43:14-24, ECF No. 139-4.[8] Detective Rickards said that he put out the photograph of Mr. Lopez to the uniform side of LCPD, and somebody came back and said that is Phillip Lopez. *Id.* 60:15-23, ECF No. 163-3. Detective Rickards also gave him Ms. Gonzales' driver's license photograph. *Id.* 51:17-52:9. Agent Boylston then made his own independent comparison of the photographs of both Mr. Lopez and Ms. Gonzales. *See id.* 49:1-18 & 59:20-25.

Agent Boylston met with Officer Gabe Martinez and showed him the driver's license photograph of Mr. Lopez, to which Officer Martinez responded, "Yep, that's our guy." Dep. of Charles Boylston 45:4-21, 49:1-18, ECF No. 163-3. Agent Boylston and Officer Martinez reviewed the Wal-Mart store's surveillance video and still photographs from different shots and angles of the shoplifters, totaling up the cost of the stolen merchandise and determining that the amount rose to the felony level. *See id.* 45:4-46:5. Based on his own examination of the photographs, Agent Boylston believed that the photographs of Plaintiffs looked like the Wal-Mart shoplifting suspects. *See id.* 51:17-52:9, 59:20-25.

---

[8] Defendants dispute that Detective Rickards positively identified Plaintiffs, relying on his testimony in which he stated that he did not "identify" anyone, but he did believe the photographs he saw looked like the people that were in the photographs sent to him. Dep. of Michael Rickards 34:6-25, ECF No. 160-5. Agent Boylston's testimony indicates that Detective Rickards identified Mr. Lopez, and the Court must construe this evidence in Plaintiffs' favor at this stage in the proceedings.

On January 9, 2015, Agent Boylston prepared Affidavits for Arrest Warrants for Plaintiffs. Affs. for Arrest Warrant, ECF No. 52-1 at 1-4 of 19. He discussed the information with his sergeant and spoke with the District Attorney's office, which approved his affidavits. Dep. of Charles Boylston 57:15-58:5, ECF No. 163-3. Agent Boylston also spoke with the magistrate court judge. *Id.* Agent Boylston filed the criminal charges against Plaintiffs, and a magistrate judge signed the warrants for arrest and the criminal complaints. *See* Warrants for Arrest, ECF No. 163-6; Criminal Compl., ECF No. 163-7. The Affidavits for Arrest Warrant for each Plaintiff are virtually identical and state:

> On Saturday, January 3, 2015, I was contacted by Walmart Asset Protection Officer Gabriel Martinez located at the Walmart on Valley Drive. Below is the following information your affiant learned from Asset Protection Officer (APO) Gabriel Martinez.
>
> APO Martinez said on [January 3, 2015] at about 2:30 p.m. he was inside the apprehension office of Walmart. He said [he] heard the alarm sensor go off by the office and he looked out of the door…He said the male subject was pushing a shopping cart with electronic items….
>
> He said he checked the surveillance video of the electronic section and observed the male subject select electronic items and then walked out of the store without paying for the merchandise.
>
> I informed APO Martinez, to send out a picture of the subject to Las Cruces Police Detective Mike Rickards and myself. A short time later, I received a text message of the subject who took the merchandise. I then informed APO Martinez, when I returned to work, I would stop by the store and review the video of the incident. This concluded the telephone conversation with APO Martinez.
>
> Upon our review, we observed Phillip Lopez enter the Walmart at approximately 2:03 p.m. with a female Feliz Gonzales and a small male child….

Affs. For Arrest Warrant, ECF No. 163-6. In the remainder of the Affidavits, Agent Boylston describes what occurred in the video, using Phillip Lopez's name wherever he describes what the man in the surveillance video did and using Feliz Gonzales' name to describe whatever the woman in the video did. *See id.*

Plaintiffs were arrested for the shoplifting at the Walmart. Defs.' Mem., UF ¶ 36, ECF No. 139. Officer Rodriguez voluntarily accompanied two other officers who arrested Mr. Lopez for the shoplifting. Pls.' Resp., UF ¶ T, ECF No. 148; Dep. of David Rodriguez 69:6-9, ECF No. 163. During that arrest, Officer Rodriguez defended his actions regarding the Taser discharges to another officer. Pls.' Resp., UF ¶ U, ECF No. 148. At that time, Officer Rodriguez was not concerned that he had misidentified Plaintiffs. Dep. of David Rodriguez 79:3-14, ECF No. 163-5. Officer Rodriguez, having reexamined the photographs since the incident, believes the photographs still kind of look like Mr. Lopez, but he now sees differences. *See* Dep. of David Rodriguez, 45:19-47:7, 59:23-60:6, 63:3-9, 79:3-14, ECF No. 148-7.

Agent Boylston later discovered that he did not have sufficient evidence to hold Plaintiffs and contacted the District Attorney's Office to get the cases dismissed. *See* Dep. of Charles Boylston 75:2-5, ECF No. 170-1. On January 15, 2015, the Third Judicial District Attorney's Office filed *nolle prosequis*, dismissing without prejudice the shoplifting charges against Plaintiffs. *See* Nolle Prosequis, ECF No. 163-8.

## II.    PROCEDURAL HISTORY

Plaintiffs brought an eight-count civil suit against Officer Rodriguez, Detective Rickards, and the City. Plaintiffs assert federal claims for excessive force and malicious prosecution, as well as state law claims for assault, battery, false arrest and imprisonment, and malicious abuse of process.

On February 16, 2016, Plaintiff Feliz Gonzales filed a Motion for Partial Summary Judgment against Defendants City of Las Cruces and Officer Rodriguez (ECF No. 28), seeking an order granting summary judgment to her as to liability on Count III against the City and Officer Rodriguez for battery under the New Mexico Tort Claims Act ("NMTCA"), N.M. Stat.

Ann. § 41-4-12, and on Count VII against Officer Rodriguez for excessive force under the Fourth Amendment. The initial Taser discharge is not at issue in her motion. Instead, Plaintiff Gonzales argues that, after she was incapacitated on the ground, the second through eleventh Taser discharges constituted an unreasonable, excessive use of force because she posed no threat. On October 11, 2016, Plaintiff Phillip Lopez filed a motion for partial summary judgment (ECF No. 131), seeking summary judgment in his favor as to liability on Count I against the City and Officer Rodriguez for assault under the NMTCA, and as to Count VI for excessive force under the Fourth Amendment, based on Officer Rodriguez pointing a gun at him.

After Plaintiffs moved for partial summary judgment, Defendants filed a motion for summary judgment on all counts and asserted qualified immunity. *See* Def.'s Mem. in Supp. of Mot. for Summ. J., ECF No. 139. The parties have thus filed cross motions for summary judgment as to Counts I, III, VI, and VII. The Court will address the federal claims first before turning to the state claims.

### III.    STANDARD

On a motion for summary judgment, the moving party initially bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (internal quotations omitted).

13

Under Rule 56(c), only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See id.* at 248.

In order to defeat a qualified immunity defense, the plaintiff must both "demonstrate that the defendant's actions violated a constitutional or statutory right" and "show that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue." *Archuleta v. Wagner*, 523 F.3d 1278, 1283 (10th Cir. 2008). A court may exercise its discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the case before it. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). For a right to be clearly established under the second prong, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). A plaintiff can demonstrate that a constitutional right is clearly established by references to on-point cases from the Supreme Court, the Tenth Circuit, or the clearly established weight of authority from other circuits. *Archuleta*, 523 F.3d at 1283.

On summary judgment, the court must consider the evidence in the light most favorable to the plaintiff when conducting the qualified immunity analysis. *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996). If the plaintiff carries his burden on qualified immunity, the burden shifts to the defendant to show that there are no genuine factual issues and he is entitled to judgment as a matter of law. *Albright*, 51 F.3d at 1535.

### IV. ANALYSIS

### A. Federal Excessive Force Claims Subject to Cross-Motions for Summary Judgment

To state an excessive force claim under the Fourth Amendment, the plaintiff must show that (1) a "seizure" occurred and (2) the seizure was "unreasonable." *Bella v. Chamberlain*, 24 F.3d 1251, 1255 (10th Cir. 1994) (quoting *Brower v. County of Inyo*, 489 U.S. 593 (1989)). Because Defendants have invoked the qualified immunity defense, Plaintiffs must also show that objectively reasonable officers could not have thought the force used was constitutionally permissible, in other words, they violated clearly established law. *Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007).

Claims of excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395-97 (1989). The reasonableness of the officer's belief as to the appropriate level of force should be judged from the perspective of an officer on the scene, rather than with the 20/20 vision of hindsight. *Id.* at 396. Among the factors that courts should consider in determining whether a police officer applied excessive force are (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* The calculus of reasonableness must allow for the fact that officers must make split-second judgments in tense, rapidly evolving circumstances. *Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009). Officers need not use the least intrusive means in the course of a detention, only reasonable ones. *Id.*

### 1. Count VI – Pulling a gun on Plaintiff Lopez

An officer can stop and briefly detain a person for an investigation if the officer has a reasonable articulable suspicion for suspecting the person of criminal activity, even if the officer lacks probable cause. *Cortez*, 478 F.3d at 1115. The use of firearms, handcuffs, and other

forceful techniques generally exceed the scope of an investigative detention and transform it into an arrest. *Id.* at 1115-16. An arrest must be supported by probable cause, which exists only if the officer knows facts that warrant a reasonable belief that the person has been or is committing a criminal offense. *See id.* Displaying firearms during an investigatory stop, however, does not violate the Fourth Amendment so long as police reasonably believe a suspect presents a serious and imminent danger to the safety of the police and public. *See United States v. Merkley*, 988 F.2d 1062, 1063-64 (10th Cir. 1993).

Pointing a firearm directly at a person involves the immediate threat of deadly force, and thus, "should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time." *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1192 (10th Cir. 2001). "Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable *to continue to aim a loaded firearm directly at that person*, in contrast to simply holding the weapon in a fashion ready for immediate use." *Id.* at 1193 (emphasis added).

Plaintiff Lopez relies on *Holland* for the assertion that it was clearly established at the time that it was unconstitutional for an officer to pull a weapon on a person who does not pose an immediate threat. The *Holland* case involved holding children at gunpoint for ten to fifteen minutes while law enforcement executed a search and arrest warrant. *See id.* at 1192-93. Contrary to Plaintiff's contention, the Tenth Circuit did not clearly establish in *Holland* that the initial pointing of weapons was unreasonable, but instead held:

> While the SWAT Team's initial show of force may have been reasonable under the circumstances, continuing to hold the children directly at gunpoint after the officers had gained complete control of the situation outside the residence was not

justified under the circumstances at that point. This rendered the seizure of the children unreasonable, violating their Fourth Amendment rights.

*Id.* at 1193.

Defendants argue that *Holland* does not establish that an officer cannot briefly point a firearm at an adult suspect who the officer saw flee from him and for whom the officer had a reasonable suspicion may have threatened a neighbor with deadly force. Defendants contend that the case of *Henry v. Storey*, 658 F.3d 1235 (10th Cir. 2011), is more on point and supports their position that Officer Rodriguez did not use excessive force. In *Henry*, police officers stopped the plaintiff after running the vehicle's license plate and getting a "hit," indicating the license plate number had been reported as stolen. *Id.* at 1238. Six officers arrived with guns aimed at the plaintiff, who then responded to all commands to pull up his shirt, walk slowly backwards to the officers, and kneel or lie down. *See id.* An officer then handcuffed him and placed him in the back of the patrol vehicle, after which the officers determined that the rental vehicle was not stolen. *See id.* at 1237-38. In holding that the officer did not use excessive force, the Tenth Circuit reasoned:

> Viewing the facts from a reasonable officer's point of view, Officer Storey did not use excessive force by pointing his weapon at Mr. Henry. Officer Storey had probable cause to believe Mr. Henry had stolen a vehicle, a felony. Officer Storey could reasonably conclude that the driver posed an immediate threat to the safety of the officers and the public—a driver caught with a stolen vehicle has strong incentive to evade arrest, given the seriousness of the crime. Further, the means of evading arrest were close at hand: the driver was in the vehicle with the engine running. The incident took place late at night, within Albuquerque city limits. Any resulting chase could place the officers and the public at risk. Although Mr. Henry was not actively resisting or evading arrest by flight, under the circumstances the amount of force used by Officer Storey was reasonable. To conclude otherwise would merely second-guess an officer's on-the-ground decision using the benefit of 20/20 hindsight.

*Id.* at 1239 (internal citations omitted). The *Storey* court further noted that only one prior Tenth Circuit case – *Holland* – had held that the officers' aiming of firearms, without more, constituted

excessive force, but the Tenth Circuit explained that *Holland* had little bearing because it involved detaining at gunpoint bystander children not suspected of any crime in the course of executing a misdemeanor warrant. *Id.* In contrast, Officer Storey aimed his weapon at an adult suspected of a serious crime. *Id.*

This case falls closer to the facts in *Storey* than *Holland*. Officer Rodriguez came to the residence to investigate a threat to kill a neighbor. Under New Mexico law, a threat that causes another person to reasonably believe that he is in danger of receiving an immediate battery is a petty misdemeanor. N.M. Stat. Ann. § 30-3-1(B).[9]  Officer Rodriguez testified that Mr. Lopez ran from him unprovoked to the residence in the dispatch. Mr. Lopez asserts he walked away quickly. For purposes of this claim, the distinction between the two versions is insignificant to the outcome. Accepting Plaintiff's version as true, Mr. Lopez admittedly hurried away upon seeing police and did not merely go about his business. Although Mr. Lopez contends he was handing off his dog so he could come out and see what Officer Rodriguez wanted, based on the fact that Mr. Lopez hurried away from Officer Rodriguez in the direction of the residence to which dispatch had informed Officer Rodriguez was the scene of the purported death threat between neighbors, it is objectively reasonable for Officer Rodriguez to have concluded at the time he followed Mr. Lopez and attempted to detain him by pulling a gun on him, that Mr. Lopez was attempting to avoid contact with law enforcement. *Cf. State v. Harbison*, 2007-NMSC-016, ¶¶ 17-20, 151 N.M. 392 (holding there was reasonable suspicion to stop defendant who was standing in group of people with individual who just completed drug sale, because when officers

---

[9] Without elaboration, Defendants assert that a threat to kill someone could either be a petty misdemeanor under NMSA § 30-3-1(B), or a third-degree felony under NMSA § 30-3-3, depending on the facts known to Officer Rodriguez. *See* Defs.' Mem. 11 n.2, ECF No. 139. In light of this Court's determination that the petty misdemeanor was a sufficiently violent crime to cause a reasonable officer to have a reasonable concern for his safety, the Court need not determine whether the facts known to Officer Rodriguez may have amounted to reasonable suspicion to investigate assault with intent to commit a violent felony under New Mexico law.

arrived, he hurried away in opposite direction). For all the foregoing reasons, Officer Rodriguez had a reasonable suspicion to detain Mr. Lopez. *See Illinois v. Wardlow*, 528 U.S. 119, 124-26 (2000) (holding that suspect's unprovoked flight upon noticing police in high crime area supported investigative detention).

That conclusion, however, does not end the inquiry because the relevant question becomes whether pointing the firearm was unreasonable in conducting an investigative detention to protect officer safety, or whether it transformed the stop into an arrest unsupported by probable cause. *See Cortez*, 478 F.3d at 1127 ("If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force."). Although the suspected crime is a petty misdemeanor, it is of a violent nature sufficient to cause an officer to have a reasonable safety concern, and thus the first *Graham* factor was slightly in favor of Defendant Rodriguez. *Cf. Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012) (holding that first *Graham* factor weighed slightly in defendant's favor where crime was assault, "by no means an insignificant offense," but where Oklahoma law treated it as a misdemeanor). Additionally, it was night and Officer Rodriguez was alone. Those factors, combined with the nature of the dispatch call, combine to give reason for Officer Rodriguez to believe the suspect could pose a threat to his safety, such that the second *Graham* factor again weighs slightly in favor of Defendants. Third, Mr. Lopez hurried away from Officer Rodriguez, reasonably indicating an attempt to evade detention by flight, and consequently, the third *Graham* factor weighs in favor of Officer Rodriguez. Finally, Officer Rodriguez pulled his gun on Mr. Lopez but changed to less lethal force as soon as he saw Mr. Lopez was not armed.

Tenth Circuit precedent indicates that officers in such circumstances are afforded leeway in briefly pointing firearms at a suspect when there is some reason to believe a safety concern exists. *See Storey*, 658 F.3d at 1238-40; *Reeves v. Churchich*, 484 F.3d 1244, 1247-49, 1260-61 (10th Cir. 2007) (after assuming that seizure occurred, concluding that detective and officer acted reasonably in briefly pointing firearm at resident in first floor apartment while attempting knock and talk with domestic violence assault suspect who lived in second floor apartment, because officers were told suspect had access to firearms and pointing of weapons was of brief and limited in duration to determining resident's threat level); *Rucker v. Hampton*, 49 F. App'x 806, 811 (10th Cir. Oct. 18, 2002) (unpublished decision) (distinguishing *Holland* and holding that officer was entitled to qualified immunity where "case involved a traffic stop unexpectedly gone awry because the suspect evaded the officer's investigatory stop and fled into an unknown residence; the officer was alone; the suspect did not submit to the officer's display of force and refused to comply with any of his directions or requests; the officer perceived a threat to his safety from the bystanding family; and only displayed his weapon very briefly as he retreated from the home"). *See also Merkley*, 988 F.2d at (concluding that officers reasonably believed suspect was dangerous based on information he had threatened to kill someone and was observed acting violently by pounding his fists on steering wheel and were justified in displaying firearms and using handcuffs to freeze temporarily the situation to ensure their and public's safety). Although the Court does not condone pointing firearms at suspects perfunctorily, considering the totality of the circumstances and Tenth Circuit law, the Court concludes that it was not clearly established that Officer Rodriguez's actions violated Mr. Lopez's Fourth Amendment rights. Accordingly, the Court will deny Plaintiff Lopez's motion for partial summary judgment as to Count I and will grant Defendants' request for summary judgment in their favor as to Count I.

### 2. Count VII – Second through Eleventh Taser Discharges against Ms. Gonzales

The use of a Taser applies force on the person "in an abrupt and violent matter." *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665 (10th Cir. 2010). It is excessive under the Fourth Amendment to use a Taser against a suspect without having any reason to believe that a lesser amount of force could not exact compliance. *See Estate of Booker v. Gomez*, 745 F.3d 405, 424-25 (10th Cir. 2014) (quoting *Casey v. City of Federal Heights*, 509 F.3d 1278, 1286 (10th Cir. 2007)). On the other hand, the use of a Taser may not violate the Fourth Amendment where the officer uses the Taser in a good faith effort to stop a detainee who is attempting to inflict harm on others or on a person resisting arrest. *See Porro v. Barnes*, 624 F.3d 1322, 1329 (10th Cir. 2010) (and citing cases).

Ms. Gonzales argues that, at the time of the second through eleventh Taser discharges, she was face-down on the ground, not resisting or fleeing. She asserts that the undisputed facts establish that Officer Rodriguez intentionally seized her with the initial Taser discharge and then unreasonably applied additional, excessive force that was not objectively reasonable given that she posed no threat to him.

Defendants contend that the additional stun cycles were objectively reasonable because Officer Rodriguez feared for his safety when Mr. Lopez refused to comply with his commands and attempted to remove the Taser prongs and stand. According to Defendants, Officer Rodriguez discharged additional stun cycles to try to prevent Mr. Lopez from removing the prongs and gain his compliance. Defendants assert that Officer Rodriguez did not realize he stunned Ms. Gonzales instead of Mr. Lopez alone. Defs.' Resp. 5, ECF No. 41. They contend he is entitled to qualified immunity because he mistakenly stunned Plaintiff Gonzales and he cannot be held liable for a mistake or negligent act.

As an initial matter, Plaintiff Gonzales contends the videotape of the incident clearly refutes Officer Rodriguez's version of events and that the Court should disregard his sworn testimony. Plaintiff instead urges the Court to determine that there is no genuine dispute that Officer Rodriguez knew he was sending additional cycles through Ms. Gonzales. She points to the fact that Defendant yelled at her to stop talking and shortly thereafter he discharged his Taser again, arguing that this evidence unequivocally establishes that he tased her intentionally.

When a party tells a version of events blatantly contradicted by the record, so that no reasonable jury could believe it, the court should not adopt that version when ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 373, 380 (2007). It is the "rare, exceptional case," in which the standard is met and the Court can resolve disputed facts. *Cordero v. Froats*, 613 F. App'x 768, 769 (10th Cir. Sept. 2, 2015). The Court has reviewed the video evidence. The video, however, does not clearly depict what is occurring through the critical stages of the incident, as the video is mostly dark until approximately the two minute 18 second mark, leaving the Court to rely primarily on the audio evidence. The audio reveals cries of a woman and a man asking why the officer is hurting is wife. Officer Rodriguez can also be heard commanding Plaintiffs to stop talking, and a Taser discharge occurs afterwards. Officer Rodriguez then, however, makes commands to "stay on the ground," so it is not completely clear whether he discharged his Taser to stop Mr. Lopez from getting up or to make Ms. Lopez stop talking. While the audio evidence would give a jury reason to doubt Officer Rodriguez's credibility when he avers that he did not know the additional discharges were stunning Ms. Gonzales, it is nonetheless possible for a reasonable jury to find Officer Rodriguez credible and determine that he believed Ms. Gonzales' cries were because of the initial Taser discharge, that he did not know his additional discharges were applying force on her, and that he discharged the Taser each time

in an effort to stop Mr. Lopez from standing. *Cf. White v. Martin*, 425 F. App'x 736, 743 (10th Cir. June 8, 2011) (unpublished opinion) (distinguishing *Scott* because videos left open questions about degree of suspect's resistance to arrest and timing and extent of force levied by trooper); *York v. City of Las Cruces*, 523 F.3d 1205, 1210-11 (10th Cir. 2008) (concluding that officers overstated relevance of *Scott* case where Supreme Court determined that unadulterated videotape blatantly contradicted plaintiff's version of events, because only part of incident involving York and police officers was captured on audio tape, portions of which were unintelligible).

Because the video evidence does not satisfy the very difficult blatant contradiction standard necessary for the Court to resolve the disputed issue of fact, in resolving Plaintiff Gonzales' motion for partial summary judgment, the Court must accept Officer Rodriguez's sworn statement of events in the light most favorable to him. *Cf. Cordero*, 613 F. App'x at 769 (holding that, although video evidence strongly supported moving parties' position, evidence did not blatantly contradict plaintiff's witnesses and the court could not resolve disputed facts). The Court will therefore analyze the parties' respective motions in the light most favorable to the non-moving party.

### a.   Whether a seizure occurred as a matter of law

In *Brower v. County of Inyo*, the Supreme Court stated that "the Fourth Amendment addresses 'misuse of power,' not the accidental effects of otherwise lawful government conduct." 489 U.S. 593, 596 (1989) (internal citation omitted). Negligent actions are not actionable under Section 1983. *See Sevier v. City of Lawrence*, 60 F.3d 695, 699 & n. 7 (10th Cir. 1995). "Violation of the Fourth Amendment requires an intentional acquisition of physical control." *Brower*, 489 U.S. at 596. "A seizure occurs even when an unintended person or thing is the

object of the detention or taking, but the detention or taking itself must be willful." *Id.* (internal

citations omitted).

As the *Brower* Court explained:

> Thus, if a parked and unoccupied police car slips its brake and pins a passerby
> against a wall, it is likely that a tort has occurred, but not a violation of the Fourth
> Amendment. And the situation would not change if the passerby happened, by
> lucky chance, to be a serial murderer for whom there was an outstanding arrest
> warrant—even if, at the time he was thus pinned, he was in the process of running
> away from two pursuing constables. It is clear, in other words, that a Fourth
> Amendment seizure does not occur whenever there is a governmentally caused
> termination of an individual's freedom of movement (the innocent passerby), nor
> even whenever there is a governmentally caused and governmentally desired
> termination of an individual's freedom of movement (the fleeing felon), but *only
> when there is a governmental termination of freedom of movement through means
> intentionally applied*. That is the reason there was no seizure in the hypothetical
> situation that concerned the Court of Appeals. The pursuing police car sought to
> stop the suspect only by the show of authority represented by flashing lights and
> continuing pursuit; and though he was in fact stopped, he was stopped by a
> different means—his loss of control of his vehicle and the subsequent crash. If,
> instead of that, the police cruiser had pulled alongside the fleeing car and
> sideswiped it, producing the crash, then the termination of the suspect's freedom
> of movement would have been a seizure.

*Id.* at 596–97 (italics added). It is "enough for a seizure that a person be stopped by the very

instrumentality set in motion or put in place in order to achieve that result." *Id.* at 599.

It is undisputed that Officer Rodriguez intended to stun Ms. Gonzales initially and she

fell to the ground face-down, where she remained during the incident. The initial use of the Taser

applied physical force against her and terminated her freedom of movement, constituting a

seizure within the meaning of the Fourth Amendment as to the initial discharge. *See California v.

Hodari D.*, 499 U.S. 621, 624-25 (1991).

Defendants' motion for summary judgment on Count VII nevertheless is based on the

argument that the second through eleventh Taser discharges of her were unintentional mistakes

that do not implicate her Fourth Amendment rights, because he did not mean to apply the

subsequent applications of force to her. Even though the initial Taser discharge seized Ms. Gonzales, to examine the subsequent applications of force through a Fourth Amendment lens, the Court must examine the reasonableness of Officer Rodriguez's intentional, not accidental, applications of force. *See Brower*, 489 U.S. at 598-99 (indicating that critical question for seizure is whether officer meant to stop suspect by instrumentality set in motion to achieve that result); *Watson v. Bryant*, 532 F. App'x 453, 457-58 (5th Cir. Feb. 4, 2013) ("In the absence of evidence showing that Bryant intended to use deadly force, we must conclude that the negligent shooting here did not itself violate Watson's Fourth Amendment rights…. An undisputedly accidental shooting, however, does not end the inquiry. Bryant still may have violated the Fourth Amendment if he acted objectively unreasonably by deciding to make an arrest, by drawing his pistol, or by not reholstering it before attempting to handcuff Derek."); *Milstead v. Kibler*, 243 F.3d 157, 163-64 (4th Cir. 2011) ("Under the first form of mistake, where the seizure is directed appropriately at the suspect but inadvertently injures an innocent person, the innocent victim's injury or death is not a seizure that implicates the Fourth Amendment because the means of the seizure were not deliberately applied to the victim…. In this vein, we have held that when officers shoot at a suspect, but hit a bystander instead, no Fourth Amendment seizure occurs."), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *McCoy v. City of Monticello*, 342 F.3d 842, 847-& n.3 (8th Cir. 2003) (noting that, after an intentional seizure has occurred when officer stopped car, an accidental shooting that occurs afterwards may not implicate Fourth Amendment, but declining to address issue because post-seizure conduct was objectively reasonable when considering intentional act of drawing the gun, not of firing gun); *Childress v. City of Arapaho*, 210 F.3d 1154, 1157 (10th Cir. 2000) (finding, in hostage shooting case, no Fourth Amendment seizure because officers intended to restrain minivan and fugitives,

not hostages, and noting that injuries to hostages were unfortunate, but not unconstitutional, accidental effect of otherwise lawful conduct).

Turning first to Defendants' motion for summary judgment, the Court concludes that the evidence, construed in Ms. Gonzales' favor, could support a jury finding that Officer Rodriguez intended to tase her and was not mistakenly and unknowingly doing so. The Court therefore cannot conclude as a matter of law that no seizure occurred.

Switching to consideration of Plaintiff Gonzales' summary judgment motion, she argues that, as a matter of law, a seizure occurred because the evidence shows all Taser discharges were not accidental. This Court, however, has found a genuine dispute of fact exists for the jury to determine whether Officer Rodriguez knew and intended to tase Ms. Gonzales for any or all of tasings 2-11. Next, Plaintiff Gonzales contends that, even if a question of fact exists as to whether Officer Rodriguez intended to tase Ms. Gonzales, she is entitled to summary judgment on the seizure issue because Officer Rodriguez intended to apply the force of the Taser against Mr. Lopez, and recklessly tased her. Defendant argues, however, that the intent Officer Rodriguez had to tase Mr. Lopez cannot be transferred to Ms. Gonzales, and that his unintentional negligent conduct in tasering her does not amount to a seizure. Defendant relies on the case of *Conner v. Rodriguez*, 891 F.Supp.2d 1228, 1239 (D.N.M. 2011), in which the Honorable William Johnson held that it was not clearly established that an officer's negligence in firing a shotgun at a suspect, instead of the intended firing of a non-lethal bean bag shotgun, violated the plaintiff's Fourth Amendment rights.

*Brower* indicates that the Court must limit its analysis under the Fourth Amendment to the intentional and volitional acts of the officer. The Court recognizes that this case presents an imperfect fit with the innocent bystander line of cases aforementioned because Officer Rodriguez

intended to, and did, seize Ms. Gonzales with his initial Taser discharge. Viewing the facts in Defendants' favor, however, the application of the additional discharges is a better fit within the innocent bystander line of cases than within the category of cases in which a seizure has been found when an officer intends to seize a suspect using a lower level of force (such as a Taser), but accidentally uses a greater level of force (a gun) against the same intended suspect. *Compare Childress*, 210 F.3d at 1156-57 (rejecting argument that officer's willful act of firing at minivan holding suspects and hostages amounted to seizure under *Brower* because officers did not intend to seize hostages within meaning of Fourth Amendment), *with Henry v. Purnell*, 501 F.3d 374, 380-81 (4th Cir. 2007) (concluding seizure occurred because officer intended to stop suspect by firing a weapon (Taser) at him and succeeded in doing so (by actually firing gun)). The seizure issue thus should be a matter for a jury to decide, precluding summary judgment for Plaintiff Gonzales. However, even if the seizure of Ms. Lopez from the initial Taser discharge constituted a seizure as a matter of law, the question of reasonableness is limited to Officer Rodriguez's intentional conduct, which as discussed in the next section, is a question that the Court must submit to the jury.

### b.  Whether the seizure was unreasonable

Defendants argue Officer Rodriguez is entitled to summary judgment and qualified immunity because Mr. Lopez posed a threat to him by refusing to follow his commands and attempting to stand, and that the application of the Taser against him was objectively reasonable under the circumstances. It is undisputed that, at the time of the second through eleventh discharges, Ms. Gonzales was face-down on the ground, did not pose an immediate threat to the safety of Officer Rodriguez or anyone else, and was not resisting arrest at that time. A jury could view the evidence in Plaintiffs' favor and determine that Mr. Lopez knew he was applying force

against Ms. Gonzales or that any mistake he made in believing he was not tasering her was not reasonable. *See Henry v. Purnell*, 652 F.3d 524, 535 (4th Cir. 2011) (explaining that officer can commit constitutionally unreasonable seizure as a result of an unreasonable factual mistake). Even if a suspect initially poses a threat to an officer, it is clearly established that it is not reasonable for an officer to repeatedly Taser an arrestee after the arrestee is under the officer's control and no threat to anyone. *See Perea v. Baca*, 817 F.3d 1198, 1204-05 (10th Cir. 2016). Moreover, Plaintiffs have submitted evidence that Mr. Lopez did not move from a seated position after he was tased, and if believed, a jury could find that Officer Rodriguez's intentional acts of discharging the Taser against Mr. Lopez 10 additional times was unreasonable. The disputes of fact that exist preclude entry of qualified immunity and summary judgment in favor of Defendant Rodriguez on Count VII.

Ms. Gonzales argues that she is entitled to summary judgment because the undisputed facts show that Officer Rodriguez's additional Taser discharges were unreasonable and excessive. Construing the facts in Defendants' favor, a reasonable jury could find that Officer Rodriguez did not mean to apply force against her for discharges two through eleven; he did not know he was doing so at the time, because he reasonably believed the Taser had the capability to tase only one connected individual at a time; and he accidentally caused her additional harm. Because the objective reasonableness inquiry is limited to Officer Rodriguez's intentional and volitional, not negligent, acts, the relevant inquiry is whether attempting to tase Mr. Lopez 10 additional times was objectively unreasonable as a matter of law. *Cf. Watson*, 532 F. App'x at 457-58 ("An undisputedly accidental shooting, however, does not end the inquiry. Bryant still may have violated the Fourth Amendment if he acted objectively unreasonably by deciding to make an arrest, by drawing his pistol, or by not reholstering it before attempting to handcuff

Derek."); *McCoy*, 342 F.3d at 847-48 (8th Cir. 2003) (where record showed officer intended to draw gun to cause suspect to submit, but officer slipped on ice and accidentally discharged his gun, "relevant inquiry is not whether Ouellette's act of firing his gun was 'objectively reasonable,' but whether, under the totality of the circumstances, his act of drawing his gun was 'objectively reasonable'").

Turning to the *Graham* analysis with this framework in mind and construing all facts and inferences in Defendants' favor, the first factor – the severity of the crime – weighs slightly in Defendants' favor. Officer Rodriguez had reason to fear for his personal safety based on Ms. Gonzales' and Mr. Lopez's actions in continuing to advance towards him and refusing to follow his commands to stop. According to Officer Rodriguez, after the initial Taser discharge, Mr. Lopez did not follow his commands to show his hands, but instead was removing the prongs and trying to stand, causing him to fear for his personal safety. Officer Rodriguez filed charges against both Plaintiffs for misdemeanor assault on a peace officer. *See* Pl.'s Ex. A, ECF No. 29-1. Although the severity of the crime was not great under the law, it was of a somewhat violent nature, and thus weighs minimally in Defendants' favor. *Cf. Morris*, 672 F.3d at 1195 (holding that first factor weighed slightly in defendant's favor where crime was assault, "by no means an insignificant offense," but where Oklahoma law treated it as a misdemeanor, and noting that in excessive force inquiry court asks whether force used would be reasonably necessary assuming arrest was warranted).

As for the second and third factors, a jury could find that Mr. Lopez was attempting to stand up to confront and advance upon Officer Rodriguez, and that he was resisting detention. A jury could therefore conclude that Officer Rodriguez acted reasonably with respect to his known, intentional applications of force. Although admittedly a close question in light of the contents of

Exhibit C, the Court ultimately concludes factual issues exist for a jury to decide and will deny Plaintiff Gonzales' partial motion for summary judgment.

### B.  Count VIII -- Fourth Amendment Claim (Shoplifting Cases)

Defendants have moved for summary judgment and qualified immunity on Count VIII. The Fourth Amendment provides:  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ."  U.S. Const., amend. IV. The Tenth Circuit "has recognized the viability of malicious prosecution claims under § 1983." *Taylor v. Meacham,* 82 F.3d 1556, 1560 (10th Cir. 1996). A § 1983 malicious prosecution claim includes the following elements: (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) termination of the original action in favor of plaintiff; (3) lack of probable cause to support the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages. *See Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008); *Pierce v. Gilchrist*, 359 F.3d 1279, 1291-97 (10th Cir. 2004).

Defendants contend that they are entitled to summary judgment because the undisputed facts show that the arrests and charges against Plaintiffs were supported by probable cause. Defendants argue that three officers responded to Detective Rickards' inquiry stating that Mr. Lopez looked like the shoplifting suspect, and Asset Protection Officer Martinez and Agent Boylston also believed they identified Plaintiffs as the shoplifters after comparing photographs of Plaintiffs and the shoplifting suspects. Additionally, Defendant Rodriguez asserts he is entitled to summary judgment because he merely was a source of identification for the affidavit supporting the warrant and had no role in preparing the affidavit. Similarly, Defendant Rickards argues that he, at most, made a good faith mistake in supplying information.

### 1.   Causation of Plaintiffs' prosecution or confinement

Plaintiffs were arrested on a warrant issued by a neutral judge. The issuance of an arrest warrant constitutes the institution of legal process for purposes of the tort of malicious prosecution. *Wilkins*, 528 F.3d at 799. "Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, … in 'objective good faith.'" *Messerschmidt v. Millender*, 565 U.S. 535 , 546 (2012) (quoting *United States v. Leon*, 468 U.S. 897, 922-23 (1984)). The Supreme Court, however, has "recognized an exception allowing suit when 'it is obvious that no reasonably competent officer would have concluded that a warrant should issue.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). It is undisputed here that neither Officer Rodriguez nor Detective Rickards prepared the warrants and Plaintiffs have not presented evidence that Defendants reviewed the warrants and affidavits before they were filed, so this exception is not applicable.

An officer is also not shielded from liability for a Fourth Amendment violation if, in support of an arrest warrant, he knowingly, or with reckless disregard for the truth, includes false statements in the affidavit or omits from the affidavit information that, if included, would have vitiated probable cause. *Taylor*, 82 F.3d at 1562. An official who causes others to file fraudulent charges against an innocent civilian may similarly be subject to suit. *See Pierce*, 359 F.3d at 1292-93, 1296 (holding that forensic chemist who allegedly lied and distorted evidence to convince prosecuting authorities to press charges cannot hide behind fact that she neither initiated nor filed charges against plaintiff). A police officer who deliberately or recklessly supplies misleading information or conceals or mischaracterizes exculpatory evidence to influence the decision to prosecute cannot hide behind the decisions of other officials whom they

defrauded. *DeLoach v. Bevers*, 922 F.2d 618, 621 (10th Cir. 1990), *called into doubt on other grounds by Mocek v. City of Albuquerque*, 813 F.3d 912 (10th Cir. 2015). For a plaintiff to demonstrate recklessness of an officer, he must present evidence that the officer entertained serious doubts as to the truth of his allegations, and a fact-finder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations. *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994). The failure to investigate a matter fully rarely suggests a knowing or reckless disregard for the truth; to the contrary, it generally is considered mere negligence. *Id.*

Based on the facts construed in Plaintiffs' favor, after Detective Rickards' identified Mr. Lopez as the suspect to Agent Boylston, Agent Boylston compared Plaintiffs' driver's license photographs and the video of the suspects and agreed, based on his own review, that Plaintiffs were the shoplifters. He also relied on APO Martinez's agreement that the male suspect looked like Mr. Lopez. Agent Boylston wrote in the affidavits supporting arrest that, "Upon our review, we observed" Plaintiffs in the surveillance video committing the shoplifting. The affidavits did not contain the specific allegations that Officer Rodriguez and/or Detective Rickards identified the shoplifters as Plaintiffs.

Although their statements were not included in the affidavit, Defendants could be liable under Section 1983 if they intentionally or recklessly identified Plaintiffs as the suspects or omitted material exculpatory information to set in motion a series of events that would skew Agent Boylston's own examination and identification and cause him to arrest Plaintiffs for the shoplifting without probable cause. *Cf. Beard*, 24 F.3d at 115-16 (explaining that officer's mistake in representations to an expert on handwriting analysis may violate Fourth Amendment if misrepresentations skewed handwriting analysis and warrant application so long as there was

at least recklessness on officer's part). A plaintiff may build a case of recklessness by inference if there are facts suggesting that an officer entertained any doubt about the veracity of his statement when he made it. *See id.*

The evidence against Defendant Rodriguez is that, after receiving a text of a photograph of a couple from a surveillance camera, he responded to Detective Rickards that the couple looked like Plaintiffs. There is no evidence that he had any other involvement in the investigation of the shoplifting crime or role in preparing the warrant. Nor is there evidence that his specific statement influenced Agent Boylston's decision to prosecute. Rather, Agent Boylston testified that he relied, in part, on Detective Rickards' statements that Mr. Lopez was the suspect and that a uniformed officer said that the man in the photograph was Phillip Lopez. There is no evidence that Officer Rodriguez said that the suspect *was* Phillip Lopez; rather, he responded that the suspects "look[ed] like" Plaintiffs. Nor is there evidence that Agent Boylston acted with malice or conspired with Officer Rodriguez to falsely charge Plaintiffs with the crime. Plaintiff has not presented sufficient evidence to show that Officer Rodriguez supplied misleading information to influence or defraud Agent Boylston or that he knew or reasonably should have known that his stating the suspects looked like Plaintiffs in response to a text message would cause Agent Boylston to file a warrant application against Plaintiffs without probable cause. *See Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990) (quoting *Conner v. Reinhard*, 847 F.2d 384, 396-97 (7th Cir. 1988)) (explaining that official who causes a citizen to be deprived of constitutional rights can be held liable if official set in motion a series of events that he knew or reasonably should have known would cause others to violate a citizen's constitutional rights). The Court will therefore grant summary judgment to Officer Rodriguez on Plaintiff's Section 1983 malicious prosecution claim based on the lack of evidence he caused the alleged constitutional violation.

In contrast, the record shows that Detective Rickards played a more active role in the shoplifting investigation and directly supplied investigative leads to Agent Boylston. The record indicates that Agent Boylston relied on Detective Rickards for help identifying suspects in shoplifting cases, and that in preparing the warrant applications, he relied on the information from Detective Rickards as well as his own comparison and APO Martinez's identification. Viewing the facts in favor of Plaintiffs, a jury could find that Detective Rickards misleadingly informed Agent Boylston that Mr. Lopez was the suspect and that a uniformed officer said that the person in the photograph was Phillip Lopez, instead of more accurately reporting that four officers thought the male suspect looked like Mr. Lopez. Detective Rickards also did not share with Agent Boylston that Officer Milks stated that the suspects in the photographs could possibly be Plaintiffs but that the photographs were too grainy to make a positive identification. A jury could construe the facts in Plaintiffs' favor and conclude that Detective Rickards' misrepresentations and omissions skewed the independence of Agent Boylston's comparison of the photographs.

For these misrepresentations and omissions to be relevant, however, there must be evidence that Detective Rickards entertained serious doubts as to the truth of his allegations or evidence from which a fact-finder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations. Unlike the other officers who said that the suspects "looked like" Plaintiffs, the evidence in Plaintiffs' favor shows that Detective Rickards affirmatively stated that the male suspect was Mr. Lopez. A jury could find that the surveillance photographs were too grainy and of too poor a quality to make such a positive identification, and consequently, that there were obvious reasons to doubt that the suspect was Mr. Lopez. Moreover, a jury might view Detective Rickards' omission of Officer Milks'

inability to make a positive identification and the text message exchange as evidence that Detective Rickards acted, at least with recklessness, because he wanted Plaintiffs to be the suspects after their alleged assault on and threats against a police officer. The Court is not permitted to weigh evidence, but instead must submit questions of fact to a jury.

## 2.   Termination of action in favor of plaintiff

Defendants next argue that the action did not terminate in Plaintiffs' favor. The record, however, indicates the deputy district attorney filed the *Nolle Proseques* due to a lack of evidence that Plaintiffs committed the crimes. Accordingly, a jury could find that Plaintiffs' evidence shows termination of the criminal case in their favor sufficient to satisfy the second element. *See Wilkins*, 528 F.3d at 802-03 (explaining that filing of *nolle prosequi* is favorable termination if circumstances surrounding dismissal indicates accused's innocence or lack of reasonable grounds for prosecution).

## 3.   Lack of probable cause

"If evidence is falsified or withheld, the probable cause determination is made by considering whether, excluding the falsified inculpatory evidence or including the withheld exculpatory evidence, probable cause existed to prosecute." *McCarty v. Gilchrist*, 646 F.3d 1281, 1286 (10th Cir. 2011). Because this malicious prosecution claim involves a judicial determination of probable cause at the warrant application stage, the court examines what information the officers revealed to the issuing judge. *See Wilkins*, 528 F.3d at 802 ("Judicial determination becomes a misnomer if information required to support probable cause remains at all times firmly lodged in the officer's head."). Probable cause exists if the facts and circumstances are sufficient to demonstrate a substantial probability that a crime has been committed and that a specific individual committed the crime. *Id.* at 801 (quoting *Wolford v.*

*Lasater*, 78 F.3d 484, 489 (10th Cir. 1996)). Where there are no genuine issues of material fact, a court may make the probable cause determination as a matter of law. *Bruner v. Baker*, 506 F.3d 1021, 1028 (10th Cir. 2007). "[W]here there is a question of fact or 'room for a difference of opinion' about the existence of probable cause, it is a proper question for a jury. *Id.*

For the same reasons aforementioned, the Court finds that there is room for a difference of opinion concerning the quality of the video and photographic evidence and whether a reasonable officer could view the video and photographic evidence and find that there was a substantial probability that Plaintiffs were the shoplifters. *Cf. Maxwell v. City of Indianapolis*, 998 F.2d 431, 435 (7th Cir. 1993) ("To the extent that the presence or absence of probable cause turns on the resemblance of Maxwell to the descriptors and photograph of the fugitive Moore, the question necessarily becomes a factual one for the jury.  In this regard, we are unable to say that a jury could not reasonably conclude on these facts that the discrepancies are too significant to support a finding of probable cause.") (internal citations omitted). The affidavits Agent Boylston submitted in support of Plaintiffs' arrest warrants were devoid of information as to how he identified Plaintiffs. Instead, he mentioned the surveillance footage and conclusorily stated that Plaintiffs were the shoplifters. There is evidence that Detective Rickards told Agent Boylston that Mr. Lopez was the shoplifter, and his statements caused Agent Boylston to make the conclusory statement in the warrant application. A jury could weigh the evidence in favor of Plaintiffs and find that a reasonable officer could not have concluded that Plaintiffs were the suspects in the surveillance video, and that there was no probable cause to support their arrests.

### 4.  Malice

Defendants contend Detective Rickards is entitled to summary judgment because he, at most, made a good faith mistake in supplying information to Agent Boylston that a number of

officers identified Plaintiffs as the couple in the photographs of the shoplifting suspects. Although there is evidence that more than one officer thought Mr. Lopez looked like the man in the photographs, as discussed above, a reasonable jury could rely on other evidence, including the text messages and the use of the Hastings photograph in the text messages, to draw inferences that Detective Rickards had an impermissible motive in trying to cause Plaintiffs to be arrested in retaliation for the incident involving an assault on a fellow officer.

### 5.   Qualified Immunity

At the time of the incident, it was clearly established that it was unconstitutional for an officer to deliberately or recklessly supply misleading information or conceal or mischaracterize exculpatory evidence to influence the decision to prosecute without probable cause. *See DeLoach*, 922 F.2d at 621. Officers, however, are immune from an unlawful arrest suit if there was "arguable probable cause," in other words, if "the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014).

The same questions of fact that preclude summary judgment also preclude this Court from determining as a matter of law that there was arguable probable cause. The Court recognizes that probable cause or arguable probable cause may exist even when identifications are not made with 100% certainty. Plaintiffs, however, have provided evidence from which a jury could find that an officer could not reasonably have believed that there was a substantial probability that Plaintiffs were the suspects based on the quality of the surveillance footage. As explained by the Seventh Circuit in *Maxwell*:

> [P]robable cause, according to an objective standard, does not require that these particular officers believed the person arrested had committed an offense but that a reasonable officer would have believed that person had committed an offense. If that is the case, the arrest is lawful even if the reasonable belief was mistaken. But

> if a reasonable officer would not have believed that Maxwell was Moore, then the officers, whatever they themselves did or did not believe, are acting contrary to clearly established law and are not entitled to immunity. In effect, we have come full circle on the probable cause question. Because we have already established that the conclusion by the three officers concerning the existence of probable cause may be found to be objectively unreasonable, they are not entitled to qualified immunity at this juncture.

*Maxwell*, 998 F.2d at 436 (internal citations omitted).

In sum, construing all inferences in Plaintiffs' favor, factual issues exist as to whether Defendant Rickards deliberately or recklessly supplied misleading information to Agent Boylston that Mr. Lopez was the male suspect in the surveillance footage, whether a reasonable officer could have believed probable cause existed, and whether Detective Rickards' representations and omissions caused Agent Boylston to file a complaint without probable cause. Accordingly, the Court must deny Detective Rickards' request for summary judgment and qualified immunity on Count VIII. *Cf. Sornberger v. City of Knoxville*, 434 F.3d 1006, 1014-16 (7th Cir. 2006) (holding that genuine issues of material fact existed as to whether arresting officers acted in good faith and had probable cause to make arrest, precluding summary judgment and qualified immunity on false arrest claim in favor of officers, in light of evidence that plaintiff bore only generic resemblance to individual captured on grainy surveillance video, difference between eyewitness description of bank robber and actual appearance of arrestee, and evidence indicating officers gave incomplete and one-sided information to state prosecutor to mislead him into authorizing arrest).

### C.  State Law Claims

The New Mexico Tort Claims Act ("NMTCA"), N.M. Stat. Ann. 1978, § 41-4-1, *et seq.*, waives immunity, as relevant here, for personal or bodily injury arising from assault, battery, false imprisonment, false arrest, malicious prosecution or deprivation of constitutional rights

caused by law enforcement officers acting within the scope of their duties. N.M. Stat. Ann. § 41-4-12. It is unclear whether the doctrine of qualified immunity, as defined in federal law, applies to state tort claims brought under the NMTCA.  *See Romero v. Sanchez*, 1995-NMSC-028, ¶ 25, 119 N.M. 690, 696 (1995) ("question[ing] the parties' assumption" that qualified immunity applies to actions brought under NMTCA and noting that it "is an open question," but declining to address issue because it had not been raised by parties). New Mexico law, however, "permits an officer 'to use such force as [is] reasonably necessary under all the circumstances' to effect an arrest." *Tanberg v. Sholtis*, 401 F.3d 1151, 1163 (10th Cir. 2005) (quoting *Mead v. O'Connor*, 344 P.2d 478, 479 (1959)). "When acting in good faith, the courts will afford [officers] the utmost protection, and they will recognize the fact that emergencies arise when the officer cannot be expected to exercise that cool and deliberate judgment which courts and juries exercise afterwards upon investigations in court."  *Mead*, 344 P.2d at 480. Under New Mexico law, then, an officer or entity may successfully defend against a charge of assault or battery by demonstrating that the officer (1) used no more force than reasonably was necessary and (2) acted in good faith. *See id.*

Generally, New Mexico courts place the determination of good faith and reasonableness with the jury. *See id.*; *Alaniz v. Funk*, 1961-NMSC-140, ¶¶ 9-11, 69 N.M. 164 (noting that in practically all wrongful death cases against officer using lethal force to apprehend felon, matter of reasonableness of actions of officer to effectuate arrest should be submitted to jury). New Mexico courts, however, have demonstrated a willingness to grant summary judgment to police officers when the facts show that the minds of reasonable jurors could not differ that the officer acted reasonably under the circumstances.  *See Alaniz*, 1961-NMSC-140, ¶¶ 9-11 (holding that,

where record indicated that reasonable minds of jury could not but agree that officer acted reasonably in attempting to apprehend felon, directed verdict was appropriate).

### 1. Count I – Assault for Pointing a Gun at Plaintiff Lopez

Under New Mexico law, "assault requires a 'threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery.'" *Romero*, 1995-NMSC-028, ¶ 12 (quoting N.M. Stat. Ann. § 30-3-1(B)); *see also Baca v. Velez*, 1992-NMCS-053, ¶ 4, 114 N.M. 13. Battery occurs when a person "acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and … an offensive contact with the person of the other directly or indirectly results." *State v. Ortega*, 1992-NMCA-003, ¶ 12, 113 N.M. 437 (quoting Restatement (Second) of Torts §§ 18 (1965)). For the assault or battery to fall within the law enforcement waiver of immunity, the officer must have intended to engage in unlawful conduct that invades the protected interest of another. *See Caillouette v. Hercules, Inc.*, 1992-NMCA-008, ¶ 17, 113 N.M. 492. Consequently, "where a police officer's actions in detaining or arresting a suspect are not unlawful, the officer is not subject to liability for the torts of assault or battery." *Realivasquez v. City of Albuquerque*, No. Civ. 03-0015 MCA/KBM, Mem. Op. and Order 29-30, ECF No. 47 (citing Restatement (Second) of Torts, § 121). If the means employed by the officer to lawfully arrest a suspect are excessive of those he is privileged to use, the officer is liable for only the amount of force that is excessive. *Id.* at 30 (citing Restatement (Second) of Torts § 133).

The parties have cross-motions for summary judgment on this claim. Plaintiff Lopez contends that Officer Rodriguez's pointing a gun at him amounted to a threat that caused him to

reasonably believe he was in danger of receiving an immediate battery, and thus, he is entitled to summary judgment. His arguments mirror those supporting his claim for summary judgment under the Fourth Amendment. Alternatively, Plaintiff argues that a question of fact exists to deny Defendants' request for summary judgment. Defendant Rodriguez asserts he is entitled to summary judgment because he acted in good faith with a reasonable suspicion to detain Mr. Lopez and legitimate safety concerns to justify his brief pointing of his firearm at Mr. Lopez.

As discussed above, the Court has concluded that Officer Rodriguez had a reasonable suspicion to detain Mr. Lopez, a reason to believe that there was a risk of danger to his personal safety, and, based on the law at the time, Officer Rodriguez would not have known that he could not briefly point his gun at Mr. Lopez to accomplish the detention. Based on the undisputed facts and the law at the time of the incident, no reasonable jury could conclude that Officer Rodriguez knew that he was acting unlawfully by using more force than reasonably necessary to detain Mr. Lopez. The Court will therefore deny Plaintiff Lopez's motion for summary judgment on Count I and grant Defendant Rodriguez's motion for summary judgment on Count I.

### 2. Count II – Assault and Battery (Initial Tasing of Both Plaintiffs)

Defendants Rodriguez and the City assert they are entitled to summary judgment on Count II, because assuming Plaintiffs' version of events to be true, Mr. Lopez continued to approach Officer Rodriguez to determine why he had drawn the gun and moved quickly in front of Ms. Gonzales to protect her from the Taser, in violation of Officer Rodriguez's commands. They also contend that tasing Ms. Gonzales was reasonable because, after he tased Mr. Lopez, she moved toward Officer Rodriguez, as evidenced by the fact that she was closer to Officer Rodriguez in the video.

According to Plaintiffs' evidence, however, Mr. Lopez followed Officer Rodriguez's orders to approach, he closed distance to show him that his hands were in the air and to ask what he wanted, Mr. Lopez moved in front of Ms. Gonzales when he saw the infrared targeting light of the Taser on her because he believed it was a targeting light from a gun, and Officer Rodriguez tasered Ms. Gonzales without provocation. Viewing the evidence in Plaintiffs' favor, Plaintiffs can satisfy the elements of battery and a jury could find that the means employed by Officer Rodriguez to arrest them were excessive of those he is privileged to use because they posed no threat to him, did not resist or flee, and obeyed his commands. Defendants are therefore not entitled to summary judgment on Count II.

### 3.   Count III – Battery (Tasings 2-11 of Plaintiff Gonzales)

Plaintiff Gonzales has also moved for summary judgment on her battery claim against Officer Rodriguez and the City. Defendants argue Officer Rodriguez is entitled to summary judgment because the subsequent tasering of Ms. Gonzales was an accident. An element of battery is intent to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact. *See Ortega*, 1992-NMCA-003, ¶ 12. Plaintiff argues that law enforcement officers may be held liable under Section 41-4-12 for negligently inflicting one of the enumerated torts, and that she is entitled to summary judgment because Defendants admit Officer Rodriguez was negligent when tasing her the ten additional times. The cases upon which she relies apply where an officer's negligence results in another person committing a battery, a situation not occurring here. *See*, *e.g.*, *Quezada v. County of Bernalillo*, 944 F.2d 710, 720 n.5 (10th Cir. 1991) ("Since the Act, as currently interpreted, makes supervisors liable for the batteries of their subordinates when supervisors negligently fail to train or supervise their subordinates, Sheriff Campbell cannot claim he is immune from suit.");

*Blea v. City of Espanola*, 1994-NMCA-008, ¶¶ 12-13 (explaining that there is no waiver of immunity under Section 41-4-12 for simple negligence, but that waiver applies where officer's negligence causes a third party to commit an enumerated tort). Because a question of fact exists as to whether Officer Rodriguez intended to stun Plaintiff Gonzales ten additional times, and intent is an essential element of battery, the Court cannot grant summary judgment to either party on Count III.

**4.  Count IV – False Arrest and Imprisonment (Shoplifting cases)**

"The tort of false imprisonment occurs when a person intentionally confines or restrains another person without consent and with knowledge that he has no lawful authority to do so." *Santillo v. N.M. Dept. of Pub. Safety*, 143 N.M. 84, 88 (Ct. App. 2007). The torts of false arrest and false imprisonment are similar in that a false arrest is merely one way of committing false imprisonment. *Id.* Notably, "[a]n officer who has probable cause to arrest a person cannot be held liable for false arrest or imprisonment, since probable cause provides him with the necessary authority to carry out the arrest." *Id.*

Defendant Rodriguez participated in the arrest of Plaintiffs pursuant to a judicially-authorized warrant that he did not prepare. Moreover, there is no evidence that he reviewed the contents of the warrant application prior to participating in the arrest such that he would know whether the warrant was supported by probable cause. Consequently, even if a jury could find from the evidence that Defendant Rodriguez harbored malice against Plaintiffs, the undisputed facts establish that he did not execute the arrest with knowledge that he had no lawful authority to do so. As for Defendant Rickards, he did not participate in the arrest of Plaintiffs. The claim against Defendant Rickards for providing false information that contributed to the bringing of

charges against Plaintiffs without probable cause falls under the tort of malicious abuse of process, rather than false arrest. Defendants are therefore entitled to summary judgment on Count IV.

### 5.   Count V – Malicious Abuse of Process

The elements of a malicious abuse of process claim are: (1) the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge; (2) a primary motive in the use of process to accomplish an illegitimate end; and (3) damages. *Durham v. Guest*, 2009-NMSC-007, ¶ 29, 145 N.M. 694. Misuse of process can be shown in one of two ways: (1) filing a complaint without probable cause, or (2) an irregularity or impropriety suggesting extortion, delay, or harassment. *Fleetwood Retail Corp. of N.M. v. LeDoux*, 2007-NMSC-047, ¶12, 164 P.3d 31. Probable cause, in the context of a malicious abuse of process claim, is "a reasonable belief, founded on known facts established after a reasonable pre-filing investigation that a claim can be established to the satisfaction of a court or jury. *The lack of probable cause must be manifest*." *Mocek v. City of Albuquerque*, 813 F.3d 912, 936 (10th Cir. 2015) (quoting *Fleetwood*, 164 P.3d at 35) (emphasis added by Tenth Circuit). Where there was at least arguable probable cause to arrest the plaintiff, the lack of probable cause was not manifest. *See id.* at 937 ("because there was at least arguable probable cause to arrest [plaintiff] for concealing identity, we cannot conclude that any lack of probable cause was manifest"). Improper motive alone cannot support a malicious abuse of process claim; rather, a plaintiff must show a use of process that involves a procedural irregularity or misuse of procedural devices or indicates the wrongful use of proceedings, such as an extortion attempt. *Id.* (citing *Lenscrafters, Inc. v. Kehoe*, 282 P.3d 758, 766 (N.M. 2012), and *Durham*, 204 P.3d at 26).

Resolution of these claims follows the Court's reasoning for its conclusion on the § 1983 malicious prosecution claim. Even assuming the facts and inferences in the record show Defendant Rodriguez harbored malice against Plaintiffs, there is insufficient evidence against him on the misuse of process element. He is thus entitled to summary judgment on Count V. A jury, however, could construe all evidence and inferences in Plaintiffs' favor and find that Detective Rickards deliberately or recklessly misled Agent Boylston to encourage him to file a complaint against Plaintiffs without arguable probable cause. The Court will therefore deny summary judgment to Detective Rickards on Count V.

### 6.   City of Las Cruces' Request for Summary Judgment

The City argues it is entitled to summary judgment on Counts I-V because neither Officer Rodriguez nor Detective Rickards is liable or negligent. The Court has agreed with Defendants that Officer Rodriguez cannot be held liable for Count I and that neither Defendant Rodriguez nor Defendant Rickards is liable for Count IV, and thus the City is likewise entitled to summary judgment on Counts I and IV.   The Court, however, has concluded that a jury must resolve questions of fact as to Defendant Rodriguez's liability for Counts II and III and as to Defendant Rickards' liability for Count V, and therefore, the City's motion for summary judgment is denied as to those claims.

**IT IS THEREFORE ORDERED** that

1. Plaintiff Feliz Gonzales' Motion for Partial Summary Judgment against Defendants City and Rodriguez (**ECF No. 28**) is **DENIED**;

2. Plaintiff Phillip Lopez's Motion for Partial Summary Judgment against Defendants City and Rodriguez (**ECF No. 131**) is **DENIED**; and

3. Defendants' Motion for Summary Judgment Based on Qualified Immunity and Governmental Immunity (**ECF No. 138**) is **GRANTED IN PART AND DENIED IN PART** as follows:

   a. Defendants' request for summary judgment on **Count I** is **GRANTED**;

   b. Defendants' request for summary judgment on **Count IV** is **GRANTED**;

   c. Defendants' request for summary judgment on **Count V** is **GRANTED as to Defendant Rodriguez but is DENIED as to Defendant Rickards and the City**;

   d. Defendants' request for summary judgment on **Count VI (Pointing a Gun at Plaintiff Lopez)** is **GRANTED** based on qualified immunity;

   e. Defendants' request for summary judgment and qualified immunity on **Count VIII** is **GRANTED as to Defendant Rodriguez** but **DENIED as to Defendant Rickards**; and

   f. Defendants' request for summary judgment on **Counts II, III, and VII is DENIED**.


_____
**UNITED STATES DISTRICT JUDGE**